IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BOOTH T. JAMES, III,              ) | |
|                                   ) | |
|    Plaintiff,        ) | |
|                                   ) | |
| v.                                ) | CASE NO.: 2:15-cv-332-MHT-GMB |
|                                   ) | [WO] |
| MONTGOMERY REGIONAL               ) | |
| AIRPORT AUTHORITY, *et al.*,      ) | |
|                                   ) | |
|    Defendants.      ) | |

### **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b)(1), this case was referred to the undersigned United States Magistrate Judge for review and submission of a report with recommended findings of fact and conclusions of law. Doc. 5.  Plaintiff Booth T. James, III, proceeding *pro se*, filed this action on May 18, 2015 (Doc. 1), and amended his allegations on two separate occasions. Docs. 23 & 34.  Following the court's resolution of Defendants' motion to dismiss (Doc. 35), the only claim before the court is for retaliation in violation of James' First Amendment right to freedom of speech after he "blew the whistle" on the purportedly illegal actions of the Montgomery Regional Airport Authority ("MRAA"). Docs. 38 & 40.  Pending before the court is a motion for summary judgment filed by Defendants MRAA, Phil Perry, and William Howell (collectively, "Defendants"). Doc. 59.  Having reviewed the record, and for the reasons that follow, the undersigned RECOMMENDS that Defendants' motion be GRANTED and that all claims asserted against Defendants be DISMISSED with prejudice.

## I. JURISDICTION AND VENUE

The court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both personal jurisdiction and venue in the Middle District of Alabama.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249−50 (1986) (citations omitted). "However, disagreement between the parties is not significant unless the disagreement presents a genuine [dispute] of material fact." *Gamble v. Pinnoak Resources, LLC*, 511 F. Supp. 2d 1111, 1122 (N.D. Ala. 2007) (internal

quotation marks omitted). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a district court considers a motion for summary judgment, all evidence and inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). "The court must avoid weighing conflicting evidence or making credibility determinations. Instead, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Gamble*, 511 F. Supp. 2d at 1122 (internal quotation marks omitted). "Where a reasonable fact finder may draw more than one inference from the facts, then the court should refuse to grant summary judgment." *Id.* (internal quotation marks omitted).

### III.  STATEMENT OF UNDISPUTED FACTS

James began working for the MRAA in 1999. Doc. 63-4 at 4. His initial rank was police officer, but by 2002 he had been promoted to the rank of Corporal and designated as a Third Shift Supervisor. Doc. 60-1 at 2; Doc. 63-4 at 72. James contends that his "employment record reveals that he was a competent and satisfactory employee from training fellow police officers to being a successful firearm instructor." Doc. 34 at 8.

In 2004, James filed a lawsuit against MRAA; the Chief of Police, Joseph James; Executive Director of the MRAA, Perry; and Assistant Director Gil Wilson alleging that "he was forced to work in a racially hostile work environment and that his non-selection for promotion was the product of disparate treatment based upon his race." *See James v.*

3

*Montgomery Reg'l Airport Auth.*, 2005 WL 2250844, at *1 (M.D. Ala. Sept. 15, 2005). MRAA's motion for summary judgment was granted and the case was dismissed. *Id.* at *7. James continued working at the airport throughout that lawsuit and after its conclusion until his termination in 2014. Doc. 63-4 at 8–9.

On October 28 2013, James submitted a 28-page letter to the MRAA Board of Directors with the subject line "Letter OF Grievance/Employment Retaliation" (the "Letter"). Doc. 60-1 at 2. The introductory paragraph of the Letter states that it is a follow-up of a conversation between James and Chester Mallory at Mallory's office in April 2013. Doc. 60-1 at 2. There is no other evidence before the court concerning the meeting with Mallory. The Letter states that, as a result of that meeting, James was advised to research the proper procedure for "filing a grievance with the Montgomery Regional Airport Board of Directors members regarding hostile work environment, racism, and supervisor acting in their official capacity to demonize [James'] name among fellow employees to cause physical injury, harm to [his] reputation, and treated different [sic] than other employees." Doc. 60-1 at 2.

The lengthy Letter covers a wide range of subjects, most of which are irrelevant to this case. The following provides an overview of each of the "parts" of the Letter with some selected excerpts. "Part 1" details James' overarching complaints about MRAA, along with his work history at the airport and the Montgomery Police Department, where he was previously employed. Doc. 60-1 at 2–3. "Part 2" discusses the facts, circumstances, and outcome of James' previous lawsuit against MRAA and others associated with the airport. Doc. 60-1 at 3–7. "Part 3" concerns James' assertions that the "Airport Authority

4

Administration is creating a monopoly, at any cost, to lock [him] out of job advancement because [he] challenged their illegal promotion process in 2003." Doc. 60-1 at 7–10.  James claims that the MRAA achieved this by rejecting his college degrees and seniority compared with other white and black employees. Doc. 60-1 at 8.  "Part 4" begins with James' assertion that he "would not put pre meditated murder pass [sic] the employee I work with at the Montgomery Regional Airport." Doc. 60-1 at 10.  James "compare[s] [his] experience working [there] in a hostile environment with my supervisors creating, murder for hire scenario, so no evidence can connect them with any wrong doing." Doc. 60-1 at 11.  James also characterizes "[c]haos and rumors," time, and transfers as "weapons" used against him within the workplace. Doc. 60-1 at 11–12.

Finally, "Part 5" discusses acts of "Pre- Plan [sic] Racism" against James, and refers to MRAA's management structure as "resembl[ing] the old southern plantation structure." Doc. 60-1 at 13.  This section also provides the bulk of James' statements about his dislike of MRAA hiring policies, its lack of other policies addressing workplace issues, specific incidences of employee misconduct, and other allegations about theft and improper evidence handling at the airport. Doc. 60-1 at 13–28.  James concludes the Letter by "ask[ing] for justice, restitution, restoration, and reconciliation for the last ten years of racism and retaliation." Doc. 60-1 at 29.

After receiving the Letter, MRAA was concerned about its contents, prompting James' placement on paid administrative leave and his evaluation by a psychiatrist. Doc. 60-2 at 4.  Perry, who was the Executive Director of MRAA from 1998 to 2016, testified that the evaluation was done "solely for the purpose of trying to determine whether or not

5

Mr. James was a threat to harm the public or his fellow officers." Doc. 60-2 at 2 & 4.  The evaluator determined that James was not likely to pose a threat to others. Doc. 60-2 at 4.  Still, Perry, who had the discretionary authority to terminate James, testified that the "report, nevertheless, did not change the disconcerting and inappropriate nature of statements made by Mr. James in regard to his fellow employees and the Airport." Doc. 60-2 at 4.

In June 2014, Perry notified James that MRAA was considering possible disciplinary action against him and scheduled a hearing for him to appear and to address the issues raised in the Letter. Doc. 60-2.  James attended the hearing and reaffirmed his previous statements. Doc. 63-4 at 30, 37.  James also repeatedly indicated at the hearing that he "love[s] his job." Doc. 63-4 at 30.

After the hearing, Perry investigated the complaints made by James in the Letter and found them to have no basis in fact. Doc. 60-3 at 3.  Perry concluded that James' statements were "hostile and offensive," "not truthful," "outlandish and facially fabricated." Doc. 60-3 at 2–3.  Perry testified that James' references to violent language, his belief that other employees would murder him, and his refusal to retract those "disconcerting" statements at the hearing, caused enough concern for Perry to terminate his employment for the safety of other MRAA employees and the general public. Doc. 60-3 at 4.

## IV. DISCUSSION

The only claim remaining before the court is for retaliation after James exercised his First Amendment rights to free speech by writing the Letter that "blew the whistle" on

Defendants' illegal conduct. Docs. 38 & 40.  As an initial matter, to survive summary judgment, this claim requires a sufficient showing that James was deprived of a right secured by the United States Constitution. *See McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (requiring § 1983 plaintiff to show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation").

"A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)).  A citizen who enters public service must accept certain limitations on his freedoms, *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006), but does not relinquish his First Amendment rights, as a citizen, to comment on matters of public interest. *See Pickering v. Bd. of Educ. of Tp. High Sch. Dist. 205, Will Co., Ill.*, 391 U.S. 563, 568 (1968); *Alves*, 804 F.3d at 1159.  The law strives for "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

To strike this balance, the court follows a four-stage analysis. *See Bryson*, 888 F.2d at 1565.  First, the court must determine whether the employee engaged in protected speech, which requires a showing that the employee (1) spoke as a citizen on (2) a matter of public concern. *See, e.g.*, *Garcetti,* 547 U.S. at 423; *Alves*, 804 F.3d at 1160.  The central

7

inquiry for the citizen requirement is whether the speech at issue "owes its existence" to the employee's professional responsibilities. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015). "Factors such as the employee's job description, whether the speech occurred at the workplace, and whether the speech concerns the subject matter of the employee's job may be relevant, but are not dispositive." *Id.*

In *Alves*, five university employees wrote an internal memorandum to university officials concerning their supervisor's poor leadership and mismanagement. The employees believed writing this memorandum resulted in their termination. 804 F.3d at 1155–58. The Eleventh Circuit found that the memorandum reported how the supervisor's conduct affected the employees' ability to fulfill their ordinary roles and duties. *Id.* at 1164–65. For example, the employees performed mandatory psychological assessments of certain students, but stated that their supervisor's lack of necessary knowledge compromised their ability to perform this function. *Id.* The court determined that, in reporting on those issues, the employees were speaking "pursuant to those duties," and thus, were speaking as employees rather than citizens. *Id.* at 1164–65; *see also Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007) (finding employee speech when employees complained to supervisors about internal mismanagement as a source of caseload problems).

In the present case, the contents of the Letter, its target audience, and its private dissemination compel the conclusion that James spoke as an employee rather than as a citizen. The substance of the Letter related principally to his employment with the Airport, and it was distributed internally to the MRAA's Board of Directors. Doc. 60-1; Doc. 60-5

8

at 11.  And James later confirmed that it was his intention to solve the issues raised in the Letter internally.  Doc. 60-5 at 18 ("The goal was, again, hopefully to resolve this internally.").  While not dispositive, sending an internal letter to a board of directors stands in sharp contrast with citizen speech made outside the workplace.  For example, in *Carter v. City of Melbourne*, many of the officer's "speech activities were conducted while off duty and included campaigning and fundraising for City Council candidates, lobbying of City Council members, and picketing and handing out pamphlets concerning [the] administration of City affairs." 731 F.3d 1161, 1169 (11th Cir. 2013); *see also Carney v. City of Dothan*, 158 F. Supp. 3d 1263, 1285–86 (M.D. Ala. 2016) (finding citizen speech when officer made posts on her personal Facebook page).

Additionally, the Letter primarily details James' perceived hostile work environment, its effect on his career trajectory, and his disagreement with MRAA procedures.  *See id.*  Several sections are centered on James' displeasure with MRAA's hiring and delegation of officers to James' shift.  For example, James complains about the additional stress of supervising an officer with a medical condition, and his disapproval of a female's placement on his shift when MRAA knew of his "prefer[ence] to hire a police officer who can physically assist [him] during an emergency." Doc. 60-2 at 15–16.  Similarly, other sections of the Letter discuss James' requests for employees to be removed from his shift and his need to "constant[ly] correct these officers for sleeping on duty, lying, and threatening other employees." *Id*. at 17.  The Letter also focuses in large part on his treatment by his coworkers and the perceived discrimination and unfair treatment he received in connection with his employment.  Because these statements report an

9

employee's complaints about a work environment and its effect on the employee's supervisory duties and daily life, the court finds them analogous to the speech in *Alves* and distinguishable from the statements in *Lane v. Franks*, which occurred outside of the workplace and were not part of the employee's ordinary duties. *See Lane v. Franks*, 134 S. Ct. 2369 (2014) (finding citizen speech when employee offered truthful testimony about information gained through employment pursuant to a subpoena). For these reasons, the court finds that James' speech was made as an employee, rather than as a citizen, and thus he has failed to establish an essential element of his § 1983 claim—namely, that the speech resulting in his purported retaliatory termination was protected speech under the First Amendment.[1]

Moreover, even if the court were to assume that James was speaking as a citizen on a matter of public concern, his claim would still fail as a matter of law. The next step of the analysis would be a "balancing test, weighing the employee's first amendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Pickering*, 391 U.S. at 568. To balance these interests, the court would consider "whether the employee's speech impairs the ability of superiors to discipline subordinates, affects harmony among co-workers, impairs working relationships for which loyalty and confidence are necessary, or interferes with the operation of the . . . entity." *Carney*, 158 F. Supp. 3d at 1286 (M.D. Ala. 2016) (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

---

[1] Having determined that James spoke as an employee, we need not ask whether the content of his speech was a matter of public concern. *See Alves*, 804 F.3d at 1165; *Boyce*, 510 F.3d at 1343.

According to Perry's testimony, the Letter "made personal attacks on virtually every employee of the Airport"; "made derogatory racial remarks toward African-American, as well as white, employees"; compared James' superior officers to "house negroes"; made repeated references to weapons; and used terms like "robbed," "raped," and "hung" in describing his experiences in the workplace. Doc. 60-2 at 2–3; *see also* Doc. 60-1.  James also stated that he "would not put pre-meditated murder pass [sic] the employee I work with." Doc. 60-1 at 3.  Perry found the conduct to be disconcerting, and it caused him concern for the safety of the public and James' coworkers. Doc. 60-2.  While James repeatedly insisted that he values his job at a later disciplinary hearing, he also refused to retract any of these statements, which concerned Perry and others at MRAA. Doc. 60-2.  The workplace animosity and distrust among coworkers implied by James' statements, coupled with his insistence that he believes his coworkers are planning to murder him, could easily impact the harmony among employees and the nature of the working relationships at MRAA, and therefore its ability to function efficiently.

This finding does not depend on explicit testimony of direct disruption caused by James' Letter.  A "[l]egitimate interest in avoiding disruption does not require proof of actual disruption." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 622 (11th Cir. 2015) (citing *Anderson v. Burke Cnty., Ga.*, 239 F.3d 1216, 1220–21 (11th Cir. 2001)).  The mere "[r]easonable possibility of adverse harm is all that is required." *Id.*  Because the undisputed evidence shows that there is a reasonable possibility of disruption here, the court finds that the scales tip in favor of MRAA, and James' First Amendment retaliation claim would fail as a matter of law on this basis as well.

In sum, the undisputed evidence demonstrates that there is no genuine dispute of material fact with respect to James' claims against the MRAA, Perry, or Howell, and that James' claims against them fail as a matter of law. Thus, these claims are due to be dismissed with prejudice.

### V.  CONCLUSION

For the reasons stated above, the undersigned RECOMMENDS that Defendants' motion for summary judgment (Doc. 59) be GRANTED, and that all claims asserted by Plaintiff Booth T. James, III against the Defendants be DISMISSED with prejudice.

It is further ORDERED that the parties are DIRECTED to file any objections to the report and recommendation no later than **August 11, 2017**. Any objections filed must specifically identify the findings in the Magistrate Judge's report and recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the district court. The parties are advised that this report and recommendation is not a final order of the court, and therefore, is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report and recommendation shall bar the party from a *de novo* determination by the district court of issues covered in the report and recommendation and shall bar the part from attacking on appeal factual findings in the report and recommendation accepted or adopted by the district court, except upon grounds of plain error or manifest justice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein* v. Reynolds Sec., Inc., 667 F.2d 33 (11th Cir. 1982).

DONE this 28th day of July, 2017.

/s/ Gray M. Borden
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE